# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0189-MR

JOHN WIMSETT                                       APPELLANT

V.
            ON APPEAL FROM NELSON CIRCUIT COURT
            HONORABLE PHILLIP PATTON, JUDGE
            NO. 21-CR-00018

COMMONWEALTH OF KENTUCKY                          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

After his first trial ended with a mistrial due to a hung jury, John Wimsett was convicted of murder and sentenced to twenty-five years' imprisonment for fatally shooting Blake Martin, his rival in a love triangle. Wimsett now appeals his conviction and resulting sentence as a matter of right. Ky. Const. § 110(2)(b). After thorough review, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

Blake Martin and Aarin Seward had known each other since they were teenagers and began dating in 2010 near the end of their high school years. Around the time they began dating, Aarin gave birth to a daughter. The father of that child voluntarily terminated his parental rights, and Blake raised the child as his own. In 2016, Aarin gave birth to another daughter who is Blake's biological child. Aarin claimed that they ended their dating relationship for

good in 2017, but they continued to co-parent the children and engage in a physical relationship. Blake also had a close relationship with Aarin's parents and worked for her father's construction business whenever he was needed.

Aarin met Wimsett in 2019 on a dating application and began dating him in August 2019. In October 2019, Aarin and Wimsett went on a trip to Walt Disney World with Aarin's children and parents. While they were there, Wimsett went through Aarin's phone and found texts between Aarin and Blake wherein she expressed that she would always love Blake but that she was with Wimsett now and wanted to move on. According to Aarin, Wimsett was at first irate about the texts because she told Blake she loved him, but that he was fine the next day. As soon as they returned from the trip, Wimsett purchased the 9mm SIG Sauer pistol which he would ultimately use to kill Blake a little over a year later.

In March 2020, the Nelson County Sheriff's Department confiscated that same gun from Wimsett for his safety and for the safety of others. It was implied, but not made entirely clear during Wimsett's trial, that he was shooting the gun at his hallucinations while inside his residence. Wimsett called 911 himself during that incident and he was not arrested.

In April 2020, a "very severe occurrence" happened between Aarin and Wimsett and, as a result of that incident, Aarin decided to no longer allow Wimsett to be around her children. Aarin also broke up with Wimsett as a result of this occurrence but began seeing him again in May 2020. She

2

claimed that at that point they were no longer in a committed relationship but continued to be in contact and have sex on a regular basis.

In September 2020, the sheriff's department returned the pistol previously confiscated to Wimsett in March 2020. The next day, Wimsett bought a hidden holster and laser sight for it. Wimsett was then out of the state for work for the entire month of October 2020. On November 7, 2020, Aarin and Wimsett went out to a local bar together. Although they were not in a committed relationship at that time, Aarin became angry at Wimsett for getting intoxicated and flirting with another woman in front of her. She claimed that at that point she made it clear she did not want to be in a relationship with him anymore. Wimsett was so distraught over this latest falling out with Aarin that he attempted to take his own life on November 10. On that occasion, he and Josh Miles, Wimsett's friend and drug dealer, were getting high. Wimsett mixed alcohol, Klonopin, and fentanyl despite Josh's warnings not to do so. Wimsett overdosed as a result of that lethal concoction, but Josh saved his life by administering Narcan.

Meanwhile, Aarin and Blake continued to co-parent her children and have an intimate relationship while Aarin was seeing Wimsett. Blake would therefore frequently come to Aarin's home to see the girls and would sometimes spend the night, but he did not live with her. At least three times in the days following his intentional overdose, Wimsett drove by Aarin's home at night, presumably to see if Blake was there. Blake's green SUV had been parked outside of the home on those nights, but Aarin lied to Wimsett and told him it

3

was her uncle's vehicle.  There is some indication Wimsett did not entirely believe this ruse, as he sent the following text to Aarin on November 14: "I thought I caught you red handed, so I thought you were over being with me.  Please try and understand.  I almost knocked on the door the 1st night, but I didn't know if I would kill him or not, so I left."

Wimsett's suspicions about the situation seemed to grow in the following days, culminating in him confronting Aarin on November 18.  Around midnight on that night, Wimsett knocked on the door and Aarin stepped outside onto her carport to talk to him.  Aarin claimed that as they were talking, Blake came to the door, smacked it with his hand, and went back to bed without saying anything to Wimsett.  Shortly after he confronted Aarin, the following text messages were exchanged between Wimsett and Josh:

> **Wimsett:** Just went over to Aarin's and she had Blake over.  It was his truck the last few nights!  I'm such an idiot for ever trusting that whore!
>
> **Josh:** I thought you already knew that[.]
>
> **Wimsett:** I didn't wanna believe it n*g[.]
>
> **Josh:** Well if you see it. . .
>
> **Wimsett:** I saw it first hand.  I almost killed a man, just to watch him die[.]

On the same night, around the same time, he sent the following messages in quick succession to Evan Hopper: "I just went over to Aarin's and Blake was there.  Done.  Over.  I almost shot him"; "She lied to me this whole time"; and "Uncle's truck my ass."

Nevertheless, true to the fundamentally chaotic nature of their relationship, by November 23 Aarin and Wimsett were discussing getting married. On November 24 they discussed spending Thanksgiving together and Aarin sent Wimsett nude photographs of herself. She testified that she probably also sent those nude photographs to Blake.

This brings us to November 25, 2020, the day of the murder. At 2:17 p.m., Aarin spoke briefly with Wimsett on the phone. She claimed that she did not invite Wimsett to her home but had told him about her plans to go out partying for the night for a Bardstown celebration known as "Turkey Kick." At some point that afternoon, prior to Wimsett's arrival, Aarin's mother had picked up her daughters to keep them for the night. Sometime around 3:30 p.m. to 3:45 p.m. Wimsett arrived at Aarin's house with Taco Bell, Aarin's alcohol of choice, and two small gifts. As this "seemed like a sweet gesture" she invited him in. Unbeknownst to her, Wimsett had his 9mm pistol in its hidden holster tucked in his waistband.

A brief interlude to explain the layout of the relevant portions of Aarin's home is necessary. The carport on the right side of the home led to a door that opened into the kitchen. On the wall opposite that door there was a rectangular cutout that provided a limited view from the kitchen into the living room, and directly across from that door was a short hallway that opened into the living room on the left-hand side. The front door of the home was in the living room in the wall that sat perpendicular to the wall with the rectangular

cutout. To the right of the front door on the same wall was a large window that overlooked the driveway and the road.

After Aarin invited Wimsett in, the pair went into the living room and sat down to eat. Unbeknownst to Aarin, Blake and a co-worker, Joe Zevotek, were driving home from work that afternoon and were about to pass her home. They had been working for Aarin's father that morning in a rural area of Jefferson County and were driving, in tandem, back to the company's workstation. Blake was in a black Kia Sportage that was registered to Aarin, and Zevotek was following him in a work truck that belonged to Aarin's father. Aarin looked out the living room window in time to see the work truck go by although she did not know who was driving it at the time.

It was undisputed that Blake had no way of knowing that Wimsett was going to be at Aarin's home that day, nor did he know that his daughters were not home. When he saw Wimsett's vehicle in Aarin's driveway, Blake attempted to slam on the brakes and pull in. But because he could not do so without Zevotek rear-ending him, he drove on for less than a quarter mile, turned around, and drove back to Aarin's house. Zevotek did not make the turn with him and instead continued down the road for nearly two miles then parked at a grocery store. When Blake pulled into Aarin's driveway, he did not block Wimsett's vehicle, he did not leave his vehicle running, and he left his phone and a loaded hunting rifle in the vehicle.

When Aarin saw Blake pull in she told Wimsett to wait in the living room and that she would handle the situation. Wimsett did not say anything to her,

6

and when she walked out of the living room towards the carport, he was still sitting on the couch. Aarin encountered Blake in the middle of the carport and told him that she had everything under control and that Wimsett was about to leave. Blake replied, "Yeah he's leaving, I'm going to tell him to f*cking leave." There was no evidence that Wimsett heard Blake make that statement. Moreover, Aarin testified that she never tried to stop Blake from entering the home or that Blake shoved her, pushed past her, or touched her in any way prior to entering the home through the carport door. Nor was there any damage to that door that would indicate Blake made a forcible entry into the home.

Aarin entered the home through the carport door behind Blake. She glanced through the cutout in the wall between the kitchen and the living room and noticed that Wimsett was no longer sitting on the couch. She thought perhaps he had gone out the front door. Instead, Wimsett had positioned himself near the front door in such a way that he could not be seen through the cutout. According to the Commonwealth's theory of the case, he had taken a hidden shooter's stance and shot Blake once into his heart the second he turned into the living room from the hallway. Aarin insisted that no words were exchanged between the men prior to the fatal shot being fired and that Blake never made it past the threshold of the living room. After the bullet struck Blake in the heart, he said "He's f*ckin' killed me" to Aarin. She responded, "No he didn't" and told Blake to go get in her vehicle so she could take him to the hospital. Blake walked back down the hallway as she retrieved

7

her cellphone from the living room and called 911. But her efforts were in vain: Blake collapsed face down in the carport and died.

Aarin's call to 911 came through at 4:13 p.m. and the first police officer arrived on scene at 4:21 p.m. That officer testified that when he arrived Aarin was hysterical and said, "He just shot him! He just shot him! He didn't say anything to him, he just shot him!" Zevotek, who had been sitting in the grocery store parking lot as the foregoing events played out, tried to call Blake twice at 4:12 p.m. and once at 4:13 p.m. He became concerned after he saw police and an ambulance speeding towards Aarin's home and drove there, arriving at the scene just after the first responders.

Meanwhile, Wimsett had immediately fled in his vehicle after the shooting. He drove to his parents' home roughly two miles away and was taken into custody without incident by 4:24 p.m. As he was being arrested, he volunteered to the officers that "it was self-defense." The 9mm SIG Sauer gun used in the shooting was found on the kitchen table of his parents' home.

At trial, Wimsett's strategy focused solely on arguing self-defense. This strategy primarily involved two components: (1) attacking Aarin's credibility; and (2) asserting that Blake and Zevotek were going to Aarin's home on the day of the shooting to carry out a plan they had previously devised to harm Wimsett.

First, as to Aarin's credibility, it was undisputed that she lied to Wimsett about Blake and vice versa. She was also not entirely forthcoming with the

8

lead investigator Detective Joshua Greenwell[1] about the nature of her relationships with both Wimsett and Blake.  To him, she made it seem as though Blake was her boyfriend and Wimsett was a jealous ex who was stalking her.  That deception was not exposed until Det. Greenwell received the data extractions from Aarin's, Wimsett's, and Blake's cellphones.

Although Aarin acknowledged lying to Det. Greenwell while testifying during the first trial, during the trial at issue she claimed she did not lie but instead had not expounded on the full truth.  Defense counsel spent hours on cross-examination pointing out inconsistencies or lies about collateral matters in Aarin's previous statements to the police, in court hearings, and at the previous trial.  It also elicited that she had filed a wrongful death suit against Wimsett on behalf of her children and implied that she therefore had a financial interest in the outcome of Wimsett's prosecution.  The defense's goal was to paint her as a pathological liar whose version of events about the shooting could not be trusted.  Crucially, however, it never pointed to any occasion on which Aarin's statement about what occurred during the shooting itself was inconsistent or had changed in any way.

As for the alleged plan between Blake and Zevotek to harm Wimsett, the defense highlighted text messages Blake sent Aarin to suggest he was as jealous over her and as obsessed with her as was Wimsett.  For example, two months before his murder Blake sent messages saying that she was all he

---

[1] At the time of Wimsett's second trial, Det. Greenwell had attained the rank of captain.  We will refer to him by the rank he held at the time of the events in question.

wanted, that he would do anything it took to be with her, begging her not to end things between them, and stating that he would "kill for" her. The defense also elicited that the night before the shooting, Aarin told Blake to leave her alone and give her space, yet he still pulled into her driveway the next day because he saw another man's vehicle there. Defense counsel also got Aarin to acknowledge that Blake was not afraid of physical confrontation and that he had been in three to four fist fights over the last few years of his life. She also conceded that Blake fought another ex-boyfriend of hers in 2019, but she testified that jealousy was not the reason for the fight.

The defense also seized upon the statement that Zevotek gave to Det. Greenwell one week after the shooting. Zevotek, who did not know Wimsett, told Det. Greenwell that "Blake just said [Wimsett] was weird and off his rocker, so I just shook it off, you know what I'm saying? We was supposed to go rough the boy up, you know what I'm saying? I thought he was just joking, but he was serious, you know?" Zevotek testified that he did not have that conversation with Blake on the day of the shooting, and that they had not discussed Wimsett at all that day. Later on in Det. Greenwell's questioning he asked Zevotek if Blake was specific about what he wanted to do to Wimsett and Zevotek responded, "No." He then said, "Well hell, I'd just take him out to the woods, and I would tie him to a tree." Zevotek testified that those were his personal thoughts and feelings, but he had never discussed anything like that with Blake, and that there was no plan between them to actually do that to Wimsett. No duct tape, rope, cords, or any accoutrements that could be

10

associated with kidnapping someone were found in the small Kia Blake was driving that day.

At any rate, even if Blake and Zevotek did have that conversation or had formed such a plan, there was no evidence that Wimsett was ever made aware of that conversation or plan. There was no evidence that Blake had ever directly threatened Wimsett, that Wimsett had heard about Blake threatening him through a third party, or that Wimsett had ever expressed to anyone that he was afraid Blake would harm him.

The defense's theory of the shooting was that Blake and Zevotek had formulated a concrete plan to harm Wimsett in some way and that they were going to Aarin's house to execute it on the day of the shooting. It theorized that Blake entered the home with some sort of "ill intent" towards Wimsett and that when Blake turned from the hallway into the living room, he was in a crouching position as though he was about to spring and attack Wimsett. It asserted that Wimsett did not have to wait for Blake "to get ahold of him" before he defended himself with deadly force.

The scene itself and the forensic evidence associated with it also had a story to tell. As noted, the carport door that Blake entered the home through was not damaged. In addition, there was no damage to any of the walls, no furniture was overturned, no items were broken, and there were no scuff marks on the floor; nothing indicated that a physical altercation between the two men occurred. A folded two-inch pocket knife was found in Blake's pocket when his autopsy was performed, but there was no blood on it, nor was there any

11

evidence that he had it or any other weapon out when he entered the home.

Furthermore, not a single drop of Blake's blood was found in the living room. Rather, his blood was found at the threshold of the living room where Aarin claimed he was standing when he was shot, and a trail of his blood led back down the hallway and out to the carport where he ultimately collapsed. The forensic pathologist that performed Blake's autopsy opined that he would have had only seconds of voluntary movement after he was shot based on where the bullet struck him. A single shell casing was on the middle of the living room carpet, but multiple witnesses stated there is no way to know with certainty where a shell casing will land after it is ejected from a firearm. A firearms expert examined the shirt Blake was wearing for the presence of gunshot residue and/or stippling. As neither were present, the expert estimated that, at a minimum, Blake was standing at least three feet away from the end of the gun barrel when it was fired.

The forensic pathologist also concluded that the trajectory of the bullet through Blake's body could be consistent with several different scenarios. Specifically, it could be consistent with Blake turning the corner into the living room and his body still being at a slight angle when the bullet struck him (the Commonwealth's theory), but it could also be consistent with Blake turning the corner "at a slightly flexed angle as if to charge" at Wimsett when he was struck (the defense's theory). The pathologist plainly stated that there was no way to know with certainty the relative positions of the shooter or the victim under the circumstances of this case.

12

After hearing, *inter alia*, the foregoing evidence over the course of a five-day trial, the jury deliberated for just over two hours before finding Wimsett guilty of murder.  He thereafter appealed raising numerous issues.  Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. Castle Doctrine

#### 1) Directed Verdict

Wimsett first asserts that the trial court erred by failing to grant his motion for directed verdict because he was entitled to immunity from prosecution under the castle doctrine.[2]  This issue is unpreserved, as Wimsett's motions for directed verdict did not argue for nor mention the castle doctrine or its requirements.  *See Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020).  Nevertheless, Wimsett has requested palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26.

> For an error to be palpable, it must be easily perceptible, plain, obvious and readily noticeable.  A palpable error "must involve prejudice more egregious than that occurring in reversible error[.]

---

[2] There is no indication from the record, nor does Wimsett assert, that he presented a motion for immunity from prosecution under Kentucky Revised Statutes (KRS) 503.085 to either the district court or circuit court.  *See Commonwealth v. Farmer*, 423 S.W.3d 690, 694–95 (Ky. 2014) ("[A] defendant may invoke KRS 503.085 immunity and seek a determination at the preliminary hearing in district court or, alternatively, he may elect to await the outcome of the grand jury proceedings and, if indicted, present his motion to the circuit judge.  A defendant may not, however, seek dismissal on immunity grounds in both courts.  Once the district court finds probable cause to believe that the defendant's use of force was unlawful, the circuit court should not revisit the issue.  In the case of a direct submission or where a defendant has elected to wait and invoke immunity in the circuit court, the issue should be raised promptly so that it can be addressed as a threshold motion.").  As we hold that the castle doctrine does not apply, and because the issue was not briefed by the parties, we do not address whether this assertion was timely raised.

13

> A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (citing *Ernst v. Commonwealth*, 160 S.W.3d 744 (Ky. 2005), *overruled on other grounds by, Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018)).

KRS 503.085(1) provides in relevant part: "(1) A person who uses force as permitted in. . . [KRS] 503.055. . .is justified in using such force and is immune from criminal prosecution[.]" KRS 503.055(1) in turn states that:

> (1) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or great bodily harm to another if:
>
>> (a) The person against whom the defensive force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle; and
>>
>> (b) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

A "residence" is not limited to one's own home, as it is defined as "a dwelling in which a person resides either temporarily or permanently or is visiting as an invited guest." KRS 503.010(5).

It was undisputed that Aarin invited Wimsett into her home on the day of the shooting. Thus, under the particular facts of this case, in order to be

14

entitled to act in self-defense under the castle doctrine Wimsett had to prove that either (a) Blake had unlawfully *and* forcibly entered the residence *and* Wimsett knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred; or (b) Blake was attempting to remove Wimsett against his will from the residence *and* Wimsett had reason to believe Blake was so doing.

Wimsett was clearly not entitled to act in self-defense under either element. Under theory (a) Blake had to unlawfully and forcibly enter the residence. Even assuming arguendo that his entry was unlawful, it was not forcible: Aarin testified that Blake did not shove her down, push past her, or touch her in any way prior to entering the home. Nor did he bust down the door, break a window, or do anything else that could be considered forcible entry. Under theory (b), even assuming that the defense's theory of the case was correct, and Blake intended to kidnap Wimsett from the residence either by himself or with Zevotek, Wimsett did not have any knowledge of that plan. Further, there was no evidence that Wimsett knew about *any* threats Blake may have previously made towards him. Thus, no error occurred and therefore no palpable error occurred.

## 2) Jury Instructions

Wimsett also alleges that the trial court erred by failing to instruct the jury on the presumption provided for by KRS 503.055(1).[3] He claims he

---

[3] To be clear, a self-defense jury instruction was provided, but it was pursuant to KRS 503.055(3), the "stand your ground" subsection of the statute. It directs that "[a] person who is not engaged in an unlawful activity and who is attacked in any

preserved this issue by tendering instructions during the first trial which included the castle doctrine presumption. But Wimsett's first trial ended in a mistrial due to a hung jury, which voided that trial in its entirety. Accordingly, the tendered instructions provided at his first trial could not serve to preserve the issue during his second trial. Moreover, during his second trial, his counsel did not tender jury instructions that included the castle doctrine presumption; did not make a motion to include the castle doctrine presumption; and did not otherwise object to the instructions on the grounds that they did not contain the castle doctrine presumption. In fact, at the second trial, counsel did not submit any version of instructions. RCr 9.54(2) directs that

> [n]o party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

Accordingly, although Wimsett has requested palpable error of this issue, he is not entitled to it.

## B. Aarin's Numerous "Outbursts"

Wimsett next argues that Aarin's repeated "outbursts" about Wimsett intending to kill Blake warrant a new trial. Wimsett alleges he preserved this

---

other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force."

issue by requesting, immediately prior to Aarin's testimony, that she be instructed "not to improperly interject irrelevant and prejudicial testimony in the trial." That is not what occurred. Immediately prior to Aarin's testimony, the defense approached the bench and requested that she be admonished, but it specifically requested (1) that she not testify that the "very severe occurrence" that occurred with Wimsett in April 2020 was that he broke her jaw; and (2) that she not say anything about Wimsett allegedly raping her. She did not testify in explanation of the occurrence or the alleged rape.

Aarin's cross-examination by the defense started late in the afternoon on the third day of trial. The "outbursts" Wimsett is referring to followed a fairly consistent pattern. When defense counsel would confront Aarin regarding a lie she told, she would admit that she lied but would further contend that it did not make any difference or change the fact that Wimsett came to her house intending to kill Blake and did so. She made nine such statements during the first day of her cross-examination, but the defense did not object to any of those instances, nor did it request an admonition.

When Aarin's cross-examination resumed on the morning of the fourth day of trial, defense counsel began by playing footage of Aarin's testimony from the first trial during which she acknowledged making false statements to Det. Greenwell regarding her relationships with Wimsett and Blake. The following exchange then occurred:

> **Aarin:** It's clear that I lied to [Wimsett] and I lied to Blake. I was traumatized after the event happened so was my brain a little bit foggy at the time? I might have said some things, but again I did not out and out tell lies to Det. Greenwell about mine and

17

[Wimsett's] relationship. I didn't elaborate on mine and [Wimsett's] relationship. But again, our relationship has nothing to do with the fact that [Wimsett] still showed up, unannounced, after he said he wanted to kill Blake, he wanted to watch Blake die, that's what he did. I told a few lies, yes. But at the end of the day [Wimsett] made claims that he wanted to watch Blake die, that's what he did. He did whatever he needed to do until that day.

**Defense:** Okay, now Ms. Seward you told us multiple times yesterday that [Wimsett] wanted to watch Blake die, he showed up, and that's what he did—

**Aarin:** I didn't tell you guys that, [Wimsett] told other people that he wanted to watch Blake die.

**Defense:** You said that multiple times yesterday—

**Aarin:** Because [Wimsett] said it and it's the truth.

**Defense:** You said it again this morning, not in response to a question. Say it again. Just go ahead and say it again.

**Aarin:** [Wimsett] told multiple people that he wanted to watch Blake die, that he was going to "shoot that mother f*cker." And he did it.

**Defense:** Okay. Go ahead and tell us again.

**Aarin:** [Wimsett] told multiple people in different ways even at different periods of time that he wanted to watch Blake die. That I was a cheater, this that the other. I didn't do anything that should've caused this to happen. [Wimsett] put that in his head, [Wimsett] lived it out.

**Defense:** Now that you've gotten to say that enough, how about you answer my questions? Okay?

**Aarin:** Okay.

**Defense:** Thank you.

A little over twenty minutes later, after discussing other subjects, the defense again brought up Aarin lying to Det. Greenwell, and the following exchange occurred:

18

**Aarin:** It's clear that I've told lies in these relationships and pointless lies after but at the end of the day I've made it very clear that I was having a relationship with [Wimsett], I told lies to Blake too. I've never told any lies about the events that happened in my house that day and we can beat around the bush on these interviews and pick my story apart and call me a liar as much as we want and waste time doing that. But at the end of the day, [Wimsett] said he wanted to kill Blake, and he showed up at my house and he did it.

**Defense:** Okay, you want to say that again?

**Aarin:** I will say it as many times as you give me the opportunity to. He showed up at my house unannounced several times and then when it was relevant (sic) and he had the gun and he finally built up the courage he finally used it.

During its closing argument, defense counsel directly addressed Aarin's numerous outbursts by stating:

And I tried to ask her questions and she just wouldn't answer and would say "he shot him cause I shot the m'fer cause I wanted to watch him die" because she knows that's in a text message so we're just going to keep saying that over and over. And, just to pull back the curtain a little bit, lawyers and prosecutors and everybody go to seminars about how to influence juries. And one of the things that you probably noticed in this case is the Commonwealth kept referring to "the night of the murder." Because, psychologically, if you hear it enough, you'll get it in your mind. It's the same way with Aarin, if she says that enough, and I don't know if she was instructed to say it or whatever, but if she says it enough then subconsciously you hear it.

Thus, not only did defense counsel fail to object to these "outbursts," he specifically asked Aarin three separate times to repeat them, and then implied during closing that she was intentionally trying to manipulate the jury. "Generally, a party is estopped from asserting an invited error on appeal." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37 (Ky. 2011). "[I]nvited errors that amount to a waiver, *i.e.,* invitations that reflect the party's

knowing relinquishment of a right, are not subject to appellate review." *Id.*

Wimsett cannot intentionally elicit testimony from a witness, argue that

testimony in a way that paints that witness in a bad light, and then assert on

appeal that said testimony mandates reversal of his conviction and a new trial.

## C. Alleged Improper Vouching

For his next assignment of error, Wimsett contends that Det. Greenwell

improperly vouched for Aarin's credibility. He concedes he did not object to

this testimony and requests review for palpable error. *See Brewer*, 206 S.W.3d

at 349. Wimsett challenges the following pieces of Det. Greenwell's testimony:

**CW:**[4] During your investigation did you take a series of
photographs of the scene?

**DG:**[5] Yes I did.

**CW:** And did you analyze and compare those photographs, the
state of the scene, to Aarin's testimony? The narrative that she
had given.

**DG:** Yes.

**CW:** Did the forensic evidence at the scene line up with her
testimony?[6]

**DG:** Yes, I believe it did.

. . .

**CW:** Does all of that [the location of Blake's blood, where Wimsett
was standing when he pulled the trigger, the lack of blood on the

---

[4] Commonwealth.

[5] Det. Greenwell.

[6] We note for clarity that although the Commonwealth uses the word
"testimony" it is not referring to Aarin's trial testimony, as she testified after Det.
Greenwell. Rather, it is referring to the statements Aarin gave to Det. Greenwell
during his investigation.

living room carpet, and the single shell casing] match exactly what Aarin Seward told you happened?

**DG:** Yes it does.

**CW:** Does any of the forensic evidence, the actual items in the house, contradict what she said?

**DG:** No, it does not.

Wimsett relies primarily on *King v. Commonwealth*, 472 S.W.3d 523 (Ky. 2015), *Hoff v. Commonwealth*, 394 S.W.3d 368 (Ky. 2011), and *Stephens v. Commonwealth*, 680 S.W.3d 887 (Ky. 2023) to support his argument that the foregoing testimony was improper vouching evidence that mandates reversal. We agree with the Commonwealth's assertion that these cases are distinguishable.

In *King*, the Appellant was convicted of sexually assaulting an eleven-year-old boy. 472 S.W.3d at 525. During his trial, the lead detective testified "that prominent local officials serving on the child sex abuse task force" recommended indicting the appellant after speaking to a social worker and the victim's parents regarding his allegations. *Id.* at 530-31. This Court held that the detective's testimony amounted to palpable error because its only purpose "was to improperly influence the jury's perception of [the victim's] account by suggesting that knowledgeable and reputable members had already accepted his testimony as truthful." *Id.* at 532.

In *Hoff*, a child rape case, the physician that treated child "was allowed to repeat at trial what [the victim] had told him during the examination, including the identification of Appellant as the perpetrator[,]" the physician's

21

report "repeated yet again all of the allegations against Appellant, went more into detail about the allegations, and described several uncharged bad acts[,]" and the physician testified that he had "no reason not to believe [the] child." 394 S.W.3d at 379, 375. This Court held that this "extensive use of inadmissible hearsay and the impermissible bolstering of [the victim's] testimony was highly prejudicial to Appellant" and therefore resulted in manifest injustice. *Id.* at 379.

In *Stephens*, another child rape case, three different witnesses were permitted to vouch for the credibility of the victim whose testimony constituted the entirety of the Commonwealth's evidence. 680 S.W.3d at 892. The first witness, a deputy jailer with whom the child had been living, testified about the child's certainty of the identity of her abuser as well as the fact that the child came forward with the allegations based upon her recently developed religious convictions. *Id.* at 901-03. The second, a social worker and forensic investigator at a child advocacy center, was permitted to testify that she found the child's story to be credible and "[had] no reason to believe that the child would lie about such serious allegations with detail." *Id.* at 903. Finally, the lead detective testified that both he and the county attorney believed the child's account and specifically stated "I fully believed her story." *Id.* at 904. This Court held that "this combined vouching testimony was highly prejudicial to [the Appellant,]" and that improper victim impact evidence that also occurred during the guilt phase of trial "when considered along with the hearsay

bolstering and vouching testimony" mandated reversal and a new trial. *Id.* at 907.

In this case, Det. Greenwell's challenged testimony was very brief statements made within the context of a five-day trial. He did not make a direct or an indirect statement that he personally believed Aarin was telling the truth. Rather, his testimony was that the evidence at the scene was consistent with her statement to him and that none of it contradicted her version of events. Moreover, Aarin's credibility was placed in a crucible from the moment the defense gave its opening statement. Indeed, a lynchpin of the defense's strategy was its attempt to convince the jury that Aarin was a liar and that it therefore could not believe her account of what occurred during the shooting. Det. Greenwell's testimony was therefore, at most, rehabilitative proof that tended to rebut the defense's argument that Aarin lied about what occurred during the shooting. *See Berry v. Commonwealth*, 680 S.W.3d 827, 841-42 (Ky. 2023).

**D. Ultimate Issue**

Wimsett claims that there were three alleged instances where Det. Greenwell was improperly permitted to opine on whether the evidence he gathered during his investigation was consistent with self-defense. But, out of the three places Wimsett has cited to in the record, the officer only commented on self-defense in two of them. Wimsett also claims that he preserved this issue via objection during those two instances, but upon review of the testimony, he did not.

During both occasions, the Commonwealth appeared to be responding to the defense's assertion during its opening statement that, had Aarin not lied to Det. Greenwell about the nature of her relationships with Wimsett and Blake, Wimsett would have never been arrested or prosecuted. Or, in other words, that the lies that she told were the sole basis on which Det. Greenwell decided there was sufficient probable cause to arrest Wimsett for murder:

> **CW:** After realizing that the only eyewitness had been misrepresenting facts to you about their relationship, did that change your belief that this was not self-defense?
>
> **DG:** No, it did not.
>
> **CW:** How come?
>
> **DG:** There was no signs of any kind of self-defense. The things that did not continue to be true were relationship based. There was nothing that showed any type of reason for defense out of Mr. Wimsett.

Wimsett did not object to this testimony. Roughly six minutes later, the Commonwealth asked him whether "during his investigation" he found "any evidence of self-defense." He responded:

> No. There was no signs of damage to doorways as if anything had been kicked in, no drywall damage behind any doors as if it had been swung open hard. Everything seemed to be standing in the living room as it should, didn't really seem to be any signs of struggle or fighting inside the room. Blood was found just at the threshold right about where she's standing in that video[7] and there was blood on the baseboard just directly behind. No blood was found inside the living room. All other blood that was found was tracing back out down the hallway across the kitchen to the carport.

---

[7] As part of his investigation, Det. Greenwell did a recorded walk through of the scene with Aarin wherein she explained the events of the shooting. That video had been played for the jury shortly prior to this testimony.

24

Wimsett did not object to this testimony either. Over ten minutes later, the Commonwealth asked Det. Greenwell if he considered "how the defendant positioned himself during the shooting" as part of his investigation. Det. Greenwell responded, "Yes that was taken into consideration." The CW then asked, "Do you find that consistent with a self-defense claim?" Before the officer could respond, the defense objected and approached the bench. The basis for the objection was that Det. Greenwell was not qualified as an expert to opine on whether how Wimsett stood was consistent with self-defense. This was similar to an objection made by the defense shortly before that Det. Greenwell was not qualified as an expert to opine on blood spatter evidence. The court sustained the objection, and the defense did not request an admonition.

Finally, over twenty minutes later, the Commonwealth asked Det. Greenwell, "Did you find any credible evidence of self-defense in this case?" Before the officer could answer the defense objected. But before the parties could approach the bench, the Commonwealth withdrew the question, and the defense did not request an admonition.

Thus, the only two occasions on which the officer gave an answer regarding self-defense, the defense did not object. But Wimsett has requested palpable error review and asserts, citing *Ordway v. Commonwealth*, 391 S.W.3d 762 (Ky. 2013),[8] that Det. Greenwell's testimony constituted an

---

[8] Wimsett has also cited to *Bussey v. Commonwealth*, 797 S.W.2d 483 (Ky. 1990) and *Nugent v. Commonwealth*, 639 S.W.2d 761 (Ky. 1982), but we agree with

improper comment on the ultimate issue in the case. However, as the Commonwealth correctly points out, *Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997), conclusively abandoned the "ultimate issue rule" in Kentucky and *Ordway* is clearly distinguishable.

In *Stringer,* the Appellant was convicted of three counts of first-degree sodomy and two counts of first-degree sexual abuse against a nine-year-old female child. *Id.* at 885. On appeal, he challenged the testimony of Dr. Larry Nunemaker, a licensed obstetrician/gynecologist who examined the victim. *Id.* at 889. Dr. Nunemaker's examination revealed "some hypertrophy in the vaginal area as well as some stretching and partial destruction of the hymen." *Id.* He was permitted to testify over defense objection that "those findings were compatible with [the child's] history that she had given me" and with "something being inserted in there, and, trying to stretch it." *Id.*

The Appellant argued on appeal that the physician's testimony was impermissible "opinion testimony as to the ultimate issue." *Id.* The Court noted that, to that point, our jurisprudence did indeed forbid ultimate issue opinion testimony, but that our decisions "[had] been inconsistent not only with respect to what is or is not the ultimate issue, but also with respect to what constitutes an expression of opinion on that issue[.]" *Id.* at 890. It further opined that the ultimate issue rule "reflects a distrust of the jury's

---

the Commonwealth's argument that, as those opinions both predate the abandonment of the ultimate issue rule in *Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997), they offer little guidance.

ability to separate the wheat from the chaff and, in that respect, is an anachronism[,]" and that the "common sense view is to receive the opinion testimony where it appears that the trier of fact would be assisted rather than impeded in the solution of the ultimate problem." *Id.* at 891 (internal quotation marks omitted). The *Stringer* Court therefore departed from the ultimate issue rule. *Id.* As for Dr. Nunemaker's testimony, it held:

> If Dr. Nunemaker had testified that he believed Appellant to be guilty, such would have been an opinion as to the ultimate issue. However, an opinion that a result is consistent with a factual scenario is not an opinion that the scenario occurred.
>
> The real question should not be whether the expert has rendered an opinion as to the ultimate issue, but whether the opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." KRE[9] 702. . . Presumably, jurors do not need assistance in the form of an expert's opinion that the defendant is guilty or not guilty. However, they usually do need the assistance of a medical expert in determining the cause of a physical condition in order to understand the evidence and determine the ultimate fact in issue. KRE 401; KRE 702.

*Id.* at 889-90. Thus, it concluded that the physician's opinion "concerned a subject peculiarly within the knowledge of a trained physician and was likely to assist the jury in determining whether [the child] had been sexually abused by Appellant. There was no error in the admission of this testimony." *Id.* at 892.

In this case, Det. Greenwell did not state that he believed Wimsett was guilty. Rather, he simply explained why in his opinion the physical evidence at the scene was not consistent with a self-defense claim. As his expertise as a law enforcement officer in analyzing a crime scene was likely to assist the jury

---

[9] Kentucky Rules of Evidence.

in determining whether Wimsett acted in self-defense, no palpable error occurred.

Nor did Det. Greenwell's testimony run afoul of *Ordway*. In *Ordway*, a death penalty case, a detective was permitted to testify over numerous defense objections "how persons who legitimately exercise the right to self-protection typically behave[]" based on "his experience investigating self-defense related homicides[.]" 391 S.W.3d at 775. The Court held that the "testimony was incompetent because it permitted the police detective to authoritatively suggest how innocent persons behave after they lawfully engage in an act of self-defense, and to then, with some measure of certainty, exclude Appellant from that class of persons based on his conduct following the shooting." *Id*. at 775-76 (citing *Johnson v. Commonwealth*, 885 S.W.2d 951 (Ky. 1994)). Concluding that the error was not harmless, the Court reversed. *Id*. at 777.

Here, Det. Greenwell did not say anything about Wimsett's behavior let alone whether that behavior excluded him or included him from a certain "class" of persons who act or do not act a certain way under similar circumstances. *See also Johnson*, 885 S.W.2d at 953 ("To permit the Commonwealth to cross examine about the habit of a class of individuals for the purpose of showing how one unique individual in that class might have acted on a given occasion would invite the jury to arbitrarily hold an individual responsible based on his membership in the class. . . [T]his Court establishes that evidence regarding the habit of or bad acts of a class of individuals should

28

also be inadmissible."). We again conclude no error occurred, palpable or otherwise.

## E. KRE 404(b) Evidence

Wimsett next alleges that his conviction must be vacated because improper character and bad act evidence permeated his trial. KRE 404(b) directs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible if it is offered for another purpose "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). Such evidence may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). We will address each piece of challenged evidence in turn.

### 1. Domestic Violence

Prior to the second trial, the defense filed a motion in limine to exclude "any mention, or inference, by Aarin Seward, or any other witness, that John Wimsett physically or sexually assaulted her[.]" The Commonwealth's response noted that it was defense counsel who elicited such testimony from Aarin during the first trial in order to demonstrate that Blake had a motive for violently confronting Wimsett. The Commonwealth argued the evidence should be admissible because it went to proof of motive, absence of mistake, and implicated Wimsett's self-defense claim. The court ultimately found that "the

29

evidence is more prejudicial than probative regarding this charged offense[,]" and that it "shall be excluded unless the door is somehow opened during trial."

Wimsett challenges three statements made by Aarin, and one made by Zevotek. The first of Aarin's statements occurred while she was explaining the history of her relationship with Wimsett. The Commonwealth noted that they broke up in November 2019 and asked her if they got back together at some point and she responded:

> [Wimsett] and I carried on, it was more like a boyfriend, girlfriend relationship until about April of 2020 and the occurrences with [Wimsett] never stopped happening, it would only increase, the severity got worse. So, April 2020 there was a very severe occurrence that happened. . . It was so severe that I decided my kids were no longer around [Wimsett] at all.

A bench conference that occurred during this portion of her testimony demonstrated that the Commonwealth was doing its best to lead Aarin so that she would not state, non-responsive to a question, that Wimsett had assaulted her. The defense also made it clear that if she did, it would request a mistrial. Consistent with the court's pre-trial ruling, Aarin was never permitted to expound on what she meant by "occurrences."

The following day, while the defense was cross-examining her, it confronted her with a text message she sent to Wimsett on November 18, 2020, where she swore on the lives of her children that she had not had sex with Blake in over two years. The following exchange then occurred:

**Aarin:** Another lie I told to [Wimsett], yeah.

**Defense:** On your children's lives you swore to that.

30

**Aarin:** Again, it was in text message I didn't have to say it out loud. Yeah I'm pacifying [Wimsett], telling him whatever I need to tell [Wimsett], we've got to this point. I was telling [Wimsett] whatever I needed to tell him until he moves out of Nelson County. It is what it is. I've got to live with this, I've got to live with the fact that I didn't go to the police, I didn't do the EPO, I've got to live with that. But we all know someone who is tied up in a toxic relationship doing whatever they need to do to get by and it is what it is.

**Defense:** Do they—

**Aarin:** Yes, they very well may say anything they need to say to pacify the corrupt, controlling, abusive person, yes.

**Defense:** Okay, and again if you want to get away from him you could have said "Yeah, I want to get back with Blake."

Later that day, during the defense's cross-examination of Zevotek, counsel was attempting to demonstrate that Zevotek and Blake had to have had a conversation about Wimsett sometime between November 18 and November 25 based on Zevotek's statement to Det. Greenwell that Wimsett would sometimes show up unannounced at Aarin's in the middle of the night:

**Defense:** We know that the only time that [Wimsett] showed up at her house out of nowhere without calling was on November 18, which was a week before this shooting occurred. So, the conversation you had with Blake was in the week between the 18th and the 25th, correct?

**Zevotek:** No, no. All of this is being put together. At the end of all this different things had happened so I'm throwing it all together right there at the detective, you know? Different things from where, you know, he had even, beat up on her, whatever, he beat up on her and then later on, he'd done multiple things. So when I was sittin' down there in front of Det. Greenwell I was puttin' all those things in there at once. It wasn't that he had had this conversation with me at no 18th of December (sic) or nothin' like that.

Again, the defense did not object or request an admonition.

31

Regarding Aarin's first challenged statement, we do not agree that this qualified as domestic violence testimony, as she was never permitted to expound on what she meant by "occurrences." And the Commonwealth never attempted to argue or imply that she meant that Wimsett had physically assaulted her.

As for Aarin's other statements and Zevotek's statement, clearly the Commonwealth did not elicit the challenged testimony as both occurred during the defense's cross-examination. Nor did the defense elicit the testimony, as both instances were non-responsive to the defense's questioning. However, "[t]he cure for accidental admission of prior bad acts is an admonition to the jury to disregard the testimony." *Boyd v. Commonwealth,* 439 S.W.3d 126, 132 (Ky. 2014) (citing *Graves v. Commonwealth,* 17 S.W.3d 858, 865 (Ky. 2000)). The defense did not request an admonition for any of the testimony that violated the court's pre-trial ruling. "When an admonition is sufficient to cure an error and the defendant fails to ask for one, we will not review the error." *Boyd,* 439 S.W.3d at 133 (citing *Lanham v. Commonwealth,* 171 S.W.3d 14, 28 (Ky. 2005)).

## 2. Drug Use

Wimsett next contends that it was reversible error to introduce evidence of Wimsett's drug use. The defense did not file a pre-trial motion to exclude such evidence, nor did it object at any time to any instance of that category of evidence being elicited during trial. Defense counsel himself stated during

32

closing argument: "People who serve in combat[10] have problems sometimes when they get back.  And a lot of them have emotional problems and mental problems and what does that often times lead to?  Drug problems.  Let's be clear, [Wimsett] had them all."

The defense also discussed Wimsett's substance use issues with both Aarin and Josh as part of its trial strategy.  For example, Aarin stated that one of the reasons that she no longer wanted to be with Wimsett was his substance use.  During the defense's cross-examination of her, it pointed out that Blake also had substance use issues presumably in an effort to further harm her credibility.  In addition, it used evidence of Wimsett's substance use disorder in an attempt to hurt Josh's credibility.  Josh testified on direct examination that he was Wimsett's friend and that he loved Wimsett and discussed Wimsett's intentional overdose.  Josh also testified about the text messages Wimsett sent him stating his intention to harm Blake and claimed that Wimsett had also made several verbal statements to that effect, i.e., he was a witness favorable to the Commonwealth.

In an effort to harm Josh's credibility on cross-examination, the defense discussed how Josh continued to sell Wimsett drugs after he had overdosed.  Defense counsel then made the rhetorical statement, "I love you [Wimsett], but give me some money for heroin and fentanyl."  We note that this statement was the first time either of those drugs were mentioned during the trial, and that

---

[10] Wimsett is a Marine Corps. Veteran.

Aarin—the Commonwealth's key witness—was candid about being a "major stoner" herself. Based on the foregoing, Wimsett cannot now argue that he is entitled to a new trial because of the introduction of his substance use. *See Quisenberry*, 336 S.W.3d at 37.

### 3. Mental Health

Similar to evidence of Wimsett's drug use, defense counsel did not file a pre-trial motion to exclude evidence of Wimsett's struggles with his mental health and never objected to any instance of that testimony being elicited at trial. And, as noted in the previous section, the defense acknowledged in its closing argument that Wimsett had "emotional problems and mental problems" due to his military service. It then read from a "Spillman report"[11] about Wimsett that had been introduced during Det. Greenwell's testimony; prior to its introduction, the defense specifically stated it had "no objection" to it being introduced. The report stated the following about Wimsett:

> highly skilled marine / knows all police tactics in house clearance of suspects / tours in Iraq and Afgan / sees things that are not there / has fired shots at what he thinks he sees / respects uniform auth. / but may not respond immed. may suffer from PTSD

Defense counsel argued that the foregoing was not evidence that Wimsett committed a crime and that he should be thanked for his service and apologized to for what it did to his mental health. Again, Wimsett cannot now

---

[11] Det. Greenwell explained that a Spillman report allows dispatch to give responding officers an idea of what to expect when interacting with a particular suspect.

argue to this Court that the admission of his struggles with mental health warrants reversal of his conviction and sentence.

### 4. Threats of Violence

Wimsett next challenges the admission of two exhibits containing text messages wherein Wimsett threatened to shoot people other than Blake. He concedes he did not object to the introduction of this evidence and requests review for palpable error. However, he waived the right to challenge this evidence on appeal. The text messages were entered as part of the Commonwealth's collective exhibit 17. Prior to the admission of that exhibit, the defense explicitly stated that it had "no objection." Thus, the argument on appeal was waived. *See Quisenberry, 336 S.W.3d at 37.*

### 5. Promiscuity

Wimsett next challenges a statement made by Aarin regarding Wimsett's alleged promiscuity. Specifically, he challenges a single statement she made that her relationship with Wimsett "was a constant battle. Drugs, women, every week." He acknowledges that he did not object to this testimony, but requests review for palpable error. We cannot say that this brief, fleeting comment that the Commonwealth did not draw attention to created a "substantial possibility that the result in the case would have been different without the error." *Brewer,* 206 S.W.3d at 349. Indeed, a much larger amount of time during the trial was dedicated to discussing Aarin's promiscuity than was ever used to discuss Wimsett's. No palpable error resulted.

35

### 6. Uncharged Federal Crime

The final piece of KRE 404(b) evidence Wimsett challenges concerns the federal Form 4473 Wimsett filled out in order to purchase the gun with which he shot Blake, and the testimony of the compliance officer who was responsible for processing that form. His sole arguments are: (1) that the Commonwealth failed to provide adequate KRE 404(c) notice of its intent to introduce this evidence; and (2) that its admission was precluded by KRE 608(b). Wimsett concedes he failed to object to the admission of this evidence and requests palpable error review.

The compliance officer testified that in order to purchase a firearm, the buyer must fill out a Form 4473. That form requires the buyer to answer "yes or no" to several questions. At trial, the Commonwealth had the compliance officer recount that Wimsett answered "no" to questions about whether he was under indictment for a felony, whether he had been previously convicted of a felony, whether he was a fugitive from justice, whether he was "an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance," whether he had been adjudicated as "a mental defective" or if he had ever been committed to a mental institution, if he had received a dishonorable discharge, or if he had ever been convicted of a misdemeanor for domestic violence. Although the Commonwealth did not argue that Wimsett had committed a federal offense, the jury could have inferred that he had based on the fact that he had answered "no" to the question of whether he was addicted to illegal substances.

36

We first hold that KRE 404(c) was not violated. That rule directs that "[i]n a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." KRE 404(c). The purpose of the rule "is to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial." *Bowling v. Commonwealth*, 942 S.W.2d 293, 300 (Ky. 1997), *overruled on other grounds by, McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky. 2011).

Here, Wimsett received adequate notice of the Commonwealth's intent to introduce this evidence. During his first trial, the same witness provided the same testimony, and the same Form 4473 was introduced into evidence. He therefore had more than adequate notice and opportunity to file a motion *in limine* against the evidence prior to his second trial, but he failed to do so. Thus, despite the Commonwealth not filing a physical, written notice of its intent to introduce this evidence prior to the second trial, Wimsett received actual notice under KRE 404(c). *See Matthews v. Commonwealth,* 163 S.W.3d 11, 20 (Ky. 2005). As for Wimsett's argument under KRE 608(b), that rule directs:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness, or (2)

37

concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry.

Wimsett did not testify on his own behalf and therefore was not a witness at trial, and the compliance officer did not testify concerning his character for truthfulness, nor was she cross-examined on that subject. KRE 608(b) does not apply.

## F. Failure to Retreat

Wimsett next challenges some statements made and evidence introduced during the trial regarding his ability to retreat. He specifically cites to one statement made by the Commonwealth in its opening statement, portions of Det. Greenwell's testimony, and portions of Aarin's testimony. During the Commonwealth's opening statement, it said:

> When Blake turned the corner, [Wimsett] fired one shot center of mass, and you saw the bullet hole. Aarin says she turned and looked and [Wimsett] still has the gun trained and Blake turns to her and says, "He's f*ckin' killed me." Aarin was flipping out, she says she sees [Wimsett] maybe reach and scoop for something and then flee out the front door, which he could have fled from the entire time. Could have gone out that door as soon as he saw Blake pull up.

The defense did not object to this statement. The following day, during Det. Greenwell's direct examination, the Commonwealth was displaying a photograph of the front door in Aarin's living room. It asked, "Did you discover anything throughout your investigation that would have prevented the defendant from walking out that door?" He responded, "No, I didn't see

38

anything that blocked or hindered any exits." Over three hours later, during the officer's re-direct examination, the following exchange occurred in response to questions the defense had asked on cross:

> **CW:** And [defense counsel] asked you, "There's nothing [Wimsett] could do but get off the couch." Could he have walked out the front door?
>
> **DG:** Could have.
>
> **CW:** [Defense counsel] said there were only seconds, seconds, for [Blake] to park his car, put it in park, open the door, walk out, walk past Aarin, come up to the house, open the door. [Wimsett] had enough time to walk out the door, didn't he?
>
> **DG:** He did.

The defense did not object to either line of questioning or request an admonition. Two days later, during Aarin's cross-examination by the defense, the defense and Aarin were discussing what appeared to be a blueprint of her home and a photograph of where all of the vehicles parked in her driveway on the day of the shooting were positioned. The following exchange occurred:

> **Defense:** In response to seeing Blake's car pull up, you get up and tell [Wimsett] "I'll take care of it, let me handle it."
>
> **Aarin:** Yes.
>
> **Defense:** Alright, now, [Wimsett] doesn't rush out the front door, he's on this couch. He doesn't go out the front door and confront Blake, does he?
>
> **Aarin:** No.
>
> . . .
>
> **Defense:** If [Wimsett] comes out the front door at that time and Blake is here they're basically face to face—

**Aarin:** If [Wimsett] would've done that it would've saved this whole entire thing because Blake's car was right here, [Wimsett's] car was right there. Blake wouldn't have even saw him because where Blake got out of his car right here he would've walked into the carport, [Wimsett] would've took this, got right in his car, he could've avoided the whole thing, but he didn't. Instead of darting out the front door he decided to "Oh, shit where should I stand? I see that hole right here so I'm going to draw my gun, take a military stance that I learned to do." And he waited for the opportunity. So as Blake comes in, Blake never ever made it past this right here, never made it. All the blood splatter? On the hallway wall, not one drop in the living room. He never made it in the living room, not even a footstep. Didn't give him the opportunity. Didn't give him the opportunity to say, "Hey man, let's talk about this. Why are you treating my baby momma like this?" Didn't give him the opportunity.

**Defense:** You finished?

**Aarin:** No. [Wimsett] also should have said "Hey, man don't come in here, I've got a gun!" He should've fired a warning shot. He should have said, "Don't come any further Blake!" He should have said any f*cking thing, but he didn't. He took his stance, he waited. He got to watch him, he watched him die.

**Defense:** So when you see Blake's car pull up, if [Wimsett] comes out the door immediately, he and Blake are both outside, correct?

**Aarin:** Yeah they're both outside but they wouldn't have been able to see each other. There was a line of cars, so Blake would have been on this side of the cars, [Wimsett] would have been on this side cars. [Wimsett] could have ran, got in his car, locked it, sped the f*ck off, but he didn't, he wanted the occurrence to happen.

**Defense:** Did you say to [Wimsett] "Sneak out the front door and jump in your car and leave?"

**Aarin:** No.

The defense did not object to this testimony or request an admonition. Thus, Wimsett's arguments are unpreserved. He nevertheless requests review for palpable error and argues solely under *Commonwealth v. Hasch,* 421 S.W.3d 349 (Ky. 2013), that reversal is mandated.

40

In *Hasch*, the Appellee was charged with murder for fatally shooting her husband, and asserted she acted in self-defense. *Id.* at 353. At trial, the Commonwealth presented, over the Appellants' objections, evidence suggesting she had an available avenue of retreat by which she could have avoided the necessity of shooting her husband. *Id.* at 360. She was ultimately convicted of reckless homicide, but the Court of Appeals reversed based upon its holding that the trial court erred by instructing the jury on that offense. *Id.* at 353. This Court granted the Commonwealth's motion for discretionary review to address the Court of Appeals' holding in light of the then-recent codification of the no duty to retreat rule. *Id.*

Wimsett is correct that *Hasch* held that evidence demonstrating a defendant is aware of a potential escape route "is not admissible for the purpose of proving that the defendant lacked a subjective belief in the necessity of using force in self-defense, or that the defendant's subjective belief in the necessity of acting in self-defense was not reasonable." *Id.* at 363. However, the Court went on to say:

> We recognize that in many, if not most, homicide and assault cases in which the justification of self-defense is presented, a full and fair presentation of the circumstances surrounding the incident will itself suggest that the defendant had an available route of retreat or an opportunity to avoid the violent response to a confrontation by leaving the scene. We do not suggest here that the trial court should limit or suppress the presentation of such evidence and thereby distort the jury's view of the entire event. When evidence of an apparent means of retreat is so intertwined in the evidence in the case that there arises a risk that the jury will be misdirected to give it improper consideration, the court should, as the trial court did in this case, give an appropriate instruction based upon KRS 503.055(3)[.]

41

*Id.* Moreover, the *Hasch* Court ultimately held that the admission of the means of escape evidence in that case was harmless error and emphasized that the jury was instructed that the Appellee had no duty to retreat. *Id.* at 363-64.

Here, the Commonwealth had to utilize photographic evidence of the scene to explain to the jury how the events of the shooting occurred. Crucial to that explanation were the relative positions of Wimsett and Blake per the testimony of the sole eyewitness, i.e., that Wimsett was standing by the front door and Blake at the threshold of the living room. In looking at those photographs, the jury could observe for themselves a means for Wimsett to escape. In other words, the ability for Wimsett to go out the front door could fairly be said to be intertwined with the other evidence in the case. And, as we have previously noted, the jury was properly instructed on no duty to retreat as provided by KRS 503.055(3). Therefore, in accordance with *Hasch*, we are unable to conclude that palpable error occurred.

## G. Improper Comment on the Exercise of a Constitutional Right

Wimsett next contends that the Commonwealth made improper comments on his refusal to consent to a search[12] of his parents' home[13] through the testimony of Officer Ian Justice. Ofc. Justice was one of the

---

[12] Wimsett also mentions that the Commonwealth solicited testimony that an attorney came to Wimsett's arrest scene. But all of the case law he has provided concerns refusal of consent to search being used as evidence of guilt. We therefore address only that issue.

[13] Although the home belonged to Wimsett's parents, it appears he was living there at the time, as the computer aided dispatch (CAD) report from the incident lists it as Wimsett's address.

42

officers that responded to Wimsett's parents' home while other officers were responding to Aarin's home. During his direct examination, the Commonwealth asked: "There was a search warrant that was prepared and executed to go into the house, is that correct?" Ofc. Justice responded in the affirmative, and the Commonwealth asked, "Why did you have to get a search warrant?" The officer responded "Typically it's protocol" before the defense objected.

During the side bench that followed the defense explained that it believed the Commonwealth was about to establish that Wimsett's father had initially consented to a search and then later revoked consent which necessitated a search warrant. The Commonwealth responded that it wanted to be able to explain to the jury why law enforcement was at the home for three hours and that the revocation of the consent required them to obtain a warrant. The trial court sustained the objection, and no testimony about revocation of consent was elicited nor was it argued by the Commonwealth in closing. Thus, no error occurred, as Wimsett's refusal to consent to the search was not used against him as evidence of guilt. *See Commonwealth v. McCarthy*, 628 S.W.3d 18, 35 (Ky. 2021) ("[W]here a search warrant was required to conduct a search, a defendant's refusal to consent to that search cannot be used against him as evidence of guilt.").

## H. Cumulative Error

Wimsett argues for reversal and a new trial under the doctrine of cumulative error, "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). As we have otherwise held that no errors occurred during Wimsett's trial, the doctrine of cumulative error has no application.

## I. Juror Misconduct

After the jury's verdict in the guilt phase was rendered on March 1, 2024, Wimsett's sentencing hearing was scheduled for April 3, 2024. Late in the day on April 2, the defense filed a motion to continue sentencing and for an evidentiary hearing regarding juror misconduct.

The motion asserted that a private investigator for the defense began interviewing jurors following Wimsett's conviction. As a result of that questioning, one of the alternate jurors who did not deliberate in the case swore an affidavit on March 29, 2024. That affidavit, which was attached to the motion, stated in its entirety:

> On February 27th, 2024[,] on the second day of the John Wimsett trial held in the Nelson County Courthouse, another female juror who was not struck as an alternate and who later deliberated the case, came into the court house and made the following statement around myself and other jurors, "I hope you all looked up the Kentucky rules on murder, they can't hide the definition of murder."

44

Wimsett argued his sentencing should be continued on the basis of the affidavit and requested the court to set an evidentiary hearing to question the jurors about potential misconduct. Instead of continuing sentencing, the trial court held oral argument on the motion prior to final sentencing on April 3. After those arguments, the court took a thirty-minute recess and thereafter orally denied the motion. It later issued a written order finding that "Wimsett was not prejudiced and the verdict should not be disturbed on this ground."

"[J]uror misconduct entitles a defendant to a new trial (or a mistrial) only if there is sufficient evidence to establish both the misconduct and resulting prejudice. Prejudice is shown whenever there is a reasonable probability or likelihood that the juror misconduct affected the verdict." *Conyers v. Commonwealth*, 530 S.W.3d 413, 427 (Ky. 2017) (internal quotation marks omitted). While it would certainly be misconduct for a juror to look to external sources for the definition of murder, the affidavit is plainly insufficient to demonstrate prejudice.

Despite the fact that the trial court was provided with the name of the alternate juror who swore the affidavit, there is no indication it was ever informed of which juror actually made the statement. And, the defense did not deny the Commonwealth's assertion that it had interviewed all of the jurors, yet only one claimed to have heard this statement and she did not deliberate. Moreover, the affidavit does not establish that the declarant juror herself looked up that definition or, if she did, that she shared that definition with the other jurors. It further states that the statement was made "around" the other

45

jurors, but it does not say where or in what context, and it does not claim that any of the other jurors, apart from the affiant, actually heard it. Even more significantly, the statement allegedly made was "*they* can't hide the definition of murder." But there is no indication, nor any way to discern, if the declarant was referring to the defense or the Commonwealth. We accordingly hold that the affidavit was insufficient to establish a reasonable probability or likelihood that the juror misconduct affected the verdict, and that the trial court did not err by denying Wimsett's request for an evidentiary hearing.

## III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Michael D. Risley
Stites Harbison PLLC

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Shawn D. Chapman
Assistant Attorney General